1998 ND 25

In the Matter of the **JUDICIAL VACANCY IN DISTRICT JUDGESHIP NO. 1 IN the CHAMBER AT JAMESTOWN, NORTH DAKOTA, SOUTHEAST JUDICIAL DISTRICT.**

No. 970365.

Supreme Court of North Dakota.

Feb. 3, 1998.

### ORDER

[¶ 1] Governor Edward T. Schafer's notification of the death of the Honorable James A. Wright, District Judge for the Southeast Judicial District, with chambers in Jamestown, was received by this Court November 7, 1997. Under Section 27–05–02.1(1), N.D.C.C., the death of Judge Wright created a judicial vacancy.

[¶ 2] Under Section 27–05–02.1, N.D.C.C., the Supreme Court is required to determine, within 90 days of receiving notice of a vacancy, whether the office is necessary for effective judicial administration. This Court may, consistent with that determination, order the vacancy be filled, the vacant office be abolished, with or without transfer of a district judgeship if necessary for effective judicial administration, or transfer the vacant office to a judicial district in which an additional judge is necessary.

[¶ 3] Under Section 27–05–01(2), N.D.C.C., the Supreme Court is required to reduce the number of district judges to 42 before January 2, 2001. The state currently has 46 district judgeships, which includes the Jamestown vacancy.

[¶ 4] After notice, a hearing concerning the vacancy in Judgeship No. 1 was held in Jamestown on January 6, 1998, before the Honorable Vernon R. Pederson, Surrogate Judge, acting as a Hearing Officer under Administrative Rule 7.2. A report has been filed by Judge Pederson.

[¶ 5] Judge Pederson found: 1) If Judgeship No.1 is abolished, leaving six judges in the Southeast Judicial District, the population per judge/referee ratio would place the Southeast Judicial District first among the seven judicial districts; 2) Caseload filings in Stutsman County, in which Judgeship No. 1 is located, increased by 221 from 1995 to 1997; 3) If Judgeship No. 1 is abolished, judges chambered elsewhere in the district would be required to travel to Jamestown to assist in providing judicial services; 4) All remaining judges in the district are several years from retirement and none are contemplating retirement before 2001; 5) A new medium security prison is scheduled to open in the spring of 1998 at the North Dakota State Hospital, which is located in Jamestown; 6) The State Hospital intends to introduce legislation which will centralize and increase mental health hearings in Stutsman County; 7) The weighted caseload study completed by the National Center of State Courts indicates an allocation of 6.72 judicial positions for the district, and if, Judgeship

No. 1 is abolished, the district would be .72 of a judicial position under the allocation identified by this study; and, 8) If the projections concerning the impact of economic activity are accurate, including the stabilized or increased area populations, there will likely be a consequent demand for judicial services.

[¶ 6] Consultation with judges and attorneys of the Southeast Judicial District concerning the disposition of the Jamestown vacancy took place in the Supreme Court courtroom on January 20, 1998.

[¶ 7] This order is based upon consideration of all information received by this Court, the reduction of the number of judgeships required by statute, and the need for continued effective judicial services in the Southeast Judicial District.

[¶ 8] Notwithstanding the weighted caseload study, when compared to other districts in the state the caseload per judge does not compel a conclusion that retention of Judgeship No. 1 is necessary within the meaning of Section 27–05–02.1, N.D.C.C. The caseload filings, while increased overall from 1996 to 1997, show significant reduction in the criminal and civil case filings, the major portion of the filings in any district. The increase in filings is in mental health, orders to show cause and small claims cases, which under the weighted caseload study, consume less time per judge than do the categories of civil and criminal cases. Although the Southeast Judicial District would be first among the seven judicial districts in the population per judge/referee ratio, that finding is subject to change should reductions occur in other districts. District-wide population is projected to decline significantly based on information provided to the Legislative Council's Interim Judiciary Committee regarding consolidation of the clerks of court. The Court is also aware that as the period of time before 2001 shortens and the number of positions available to vacate reduces, the ability of this Court to comply with the legislative requirement to reduce the number of judges to 42 by 2001 is limited. While it is a difficult decision, it therefore follows that abolition of Judgeship No. 1 is necessary to comply with subsection 2 of Section 27–05–01, N.D.C.C., which requires the total number of district judges be reduced to 42 before January 2, 2001, and to heed the legislative intent that judgeships be abolished through attrition rather than by abolition of occupied judgeships.

[¶ 9] The caseload per judge does not, at this time, compel the transfer of a judgeship from another district to Jamestown or to another chamber in the Southeast Judicial District to fulfill a need for judicial services. If caseload, population and commercial activity indicate a district-wide increase in the need for judicial services, the Court may transfer a judgeship from outside the Southeast Judicial District to the Southeast Judicial District under the authority of Section 27–05–02.1(5), N.D.C.C.

[¶ 10]IT IS THEREFORE ORDERED, that Judgeship No. 1 at Jamestown in the Southeast Judicial District is abolished.

[¶ 11] The abolition of the Jamestown judgeship is ordered with the intent and confidence that the Honorable John T. Paulson, Presiding Judge of the Southeast Judicial District, together with the judges of the district, and their successors, will continue to do their best to provide, through assignment, routine, effective judicial services to the area served by Judgeship No. 1.

[¶ 12] If projections regarding caseload and commercial activity prove accurate, this Court will, upon petition or on the Court's own motion, consider transferring a judgeship from outside the Southeast Judicial District to the Southeast Judicial District under Section 27–05–02.1(5), N.D.C.C.

[¶ 13] Dated at Bismarck, North Dakota, this 3rd day of February, 1998.

[¶ 14] VANDE WALLE, C.J., and NEUMANN and SANDSTROM, JJ., concur.

STATEMENT FOR FILLING VACANCY

MESCHKE, Justice.

[¶ 15] I vote to fill this vacancy. I recognize that this is a difficult decision for my colleagues, but the best evidence available, in my opinion, favors filling this vacancy.

[¶ 16] According to the final report in December 1997 from the National Center of

State Courts on the North Dakota District Court Weighted Caseload study, the Southeast Judicial District currently needs seven trial judges. *Id.* at 23. If we abolish this one, the Southeast District would be one judge short of meeting the needs for judicial services to the people there.

[¶ 17] The Weighted Caseload study "provides a foundation for assessing judicial resource needs." *Id.* It "approximates the need for" judges. *Id.* Unless and until changes and time demonstrate the study is no longer valid, we should use and act on it, or it was empty effort. I do not mean to say that I think it is rock-solid. Quite to the contrary, I am very concerned about what it did not take into account. In my opinion, it documents only the minimum of judicial resources needed for the current workload.

[¶ 18] The report accounts for 46 judgeships and 6.8 referees (some part-timers) who do judicial work now, totaling 52.8 bodies, or judicial "full-time equivalents" (FTE's). In the report's jargon, *id.* at iii, it concludes: "There is an overall positive measure of 3.84 FTE judicial resources statewide," implying that we have nearly four judges too many for current judicial work. Yet, the report cautions that its "quantitative" measure "must be tempered with qualitative considerations and interpreted in a social, cultural, and political framework. For example, a sparsely populated area may need a judge to provide reasonable access to justice even if caseload figures do not fully justify the position." *Id.* The Southeast District encompasses ten counties that are largely rural.

[¶ 19] My concerns are qualitative ones that go beyond any quantitative measure of the workload. A safety factor of only seven percent (3.84 extra judges divided by 52.8 total judges equals 7.27%) is a thin margin, when the judicial branch has so little control over the constant waves of work that reach it. The volume of filings has constantly trended to increase. The causes are varied but incessant—legislative enactments and executive actions, as well as economic and social changes. The report does not confront the future effect of those trends.

[¶ 20] Besides constant workload growth, the judgeship side of the workload-judges equation, has random and uncontrollable events that handicap the trial courts. For example, in recent memory, one trial judge was gravely injured in a courtroom shooting, and it took over a year for his complete recovery and return to full-time efforts. The vacancy we consider today occurred from a random event—the accidental death, of Judge Wright in the course of his work. Even if this vacancy is filled, the judicial system will have been without one judge for nearly a half-year, or a one-half FTE shortfall. An unexpected vacancy always takes time to fill, properly done. While a retired surrogate can, and did, fill in some, that is not nearly the same as a full-time judge who can handle major cases with continuity over several years. Also, a single or group of complex cases can, and often do, tie up one trial judge for months at a time. Like events have frequently happened, and will continue to happen. The report could not and did not "quantify" these factors.

[¶ 21] My colleagues, who are voting to abolish this judgeship, feel the dynamic pressure of the looming deadline to "downsize" the judiciary that requires deletion of four more judgeships. The legislative directive requires that goal to be completed by December 31, 2000. NDCC 27–05–01(2). I respect and understand that "squeeze." But I disagree.

[¶ 22] There are two other judicial openings pending, each from an announced retirement by the end of 1998 that we presently have under consideration to abolish. Granted, if we abolish those pending judgeships, as we probably will, and keep this one, there will still be two more judgeships necessary to terminate by December 31, 2000. Yet, there are nearly three more years and one more legislative session to go before the final "cuts" become necessary. *See* NDCC 27–05–02.1(3). Experience suggests to me that two more judgeships will likely come open by then to consider for abolition, if still necessary.

[¶ 23] Whether that should be done should be carefully reconsidered with the 1999 session of the Legislature. According to the Weighted Caseload study, abolishing four more judgeships will leave the judicial sys-

tem with a fraction less than the minimum needed. If no judge slows down seriously from age, accident, or illness, the judicial system will no doubt hobble along. But, clearly, the remaining judges will not be able to provide the kind of judicial service the public, the legal profession, and our government institutions (including the Legislature) have come to expect.

[¶ 24] We have all come to expect prompt and efficient disposition of disputes in the last quarter-century, while this state's judicial branch was modernized under the leadership of former Chief Justice Ralph J. Erickstad. Remembering the poor state of judicial services in this state when I began to practice law forty-five years ago, I believe the court system will deteriorate without adequate judicial resources. I do not want to participate in a retreat to that past.

[¶ 25] In my opinion, we should ask the 1999 Legislative session to back away from the mandatory-reduction-of-judgeships law and to amend it to authorize a more flexible approach. The Legislature should give the Supreme Court authority to abolish, move, or keep four judgeships besides the forty-two minimum mandated. While some more judgeships might reasonably be abolished temporarily where the current Weighted Caseload study suggests they are not presently needed, the judicial branch ought to have a discretionary safety net of trial-judge positions. The Legislature can, and should, delegate on-going discretionary authority to this Court to re-create and place those judgeships when and where they are needed, as changes and experience require.

[¶ 26] My vote to fill this vacancy and my intended vote to abolish the other two judgeships now under consideration rest on the idea that four positions should be delegated to the Supreme Court as a safety net to abolish, move, or place as judicial experience dictates, rather than by guesswork.

[¶ 27] With this assessment, I join with Justice Maring in concluding that Judgeship No. 1 at Jamestown in the Southeast Judicial District is necessary for effective judicial administration in that district. I therefore vote to fill the vacancy.

[¶ 28] Herbert L. Meschke

## STATEMENT FOR FILLING VACANCY

MARING, Justice.

[¶ 29] I vote to fill this vacancy. I, too, recognize this is a difficult decision in the face of legislation which mandates that the Supreme Court reduce the number of district court judges servicing the state to 42 by the year 2001. When I, however, consider the documentary evidence, the testimony, and the findings of fact of Surrogate Judge Vernon Pederson, I am convinced the Southeast Judicial District needs this judicial position filled.

[¶ 30] Under Administrative Rule 7.2, we are to consider six criteria including population, caseload, trends in population and caseload, the impact on travel time, the age and retirement of the remaining judges, and the facilities available. When these criteria are applied to the facts, the evidence weighs heavily in favor of the need to fill this judicial position.

[¶ 31] The only criterion which appears to weigh against filling the vacancy is population. The North Dakota State Census Data Center report indicates a downward trend for the Southeast region. The socio-economic trends, however, indicate an increase in the labor force. Loss of population from our rural areas is but one factor to be considered. It does not necessarily translate into less judicial work or fewer court filings. The case filings in Stutsman County increased between 1995 and 1997, while reportedly the population is decreasing.

[¶ 32] Jamestown is unique in that it is the location of the North Dakota State Hospital and the new medium security state prison facility. These facilities are a source of potentially significant future case filings. There is discussion of the introduction of legislation which would permit all mental health hearings to be held in Jamestown. The new prison population is also certain to generate motions and petitions.

[¶ 33] Our court retained the National Center for State Courts to conduct a weighted caseload study to provide "quantitative" documentation of judicial resource needs in our state trial courts. That study concluded the Southeast Judicial District requires 6.72 judges based on its caseload, which justifiably should be rounded to seven judges.

[¶ 34] With respect to future needs for judicial resources, the weighted caseload study emphasizes that it does not determine "the *exact* number of judges needed to stay current with caseloads," but only "*approximate* [s]" the number of judges needed today. It provides a model which can be applied to projected case filings to predict future judicial resource needs, but the study does not make these projections. The study also points out that the model must be "tempered" with qualitative considerations such as legal "cultural" differences, "circuit riding," and "economies of scale."

[¶ 35] Agricultural Economics Professor, F. Larry Leistritz, North Dakota State University, concluded in his report "Economic Effects of New Economic Development Projects in Southeastern North Dakota" new economic development in Wahpeton, Valley City, and Carrington has created substantial numbers of new jobs in Southeastern North Dakota and the "population of several counties is growing or stabilized, and further growth through in-migration is a possibility in the next few years." The Southeastern region is adjacent to the fastest growing area in population and economic development in the state, the eastern part of the state. It is well-documented that business and commercial litigation is accounting for the greatest increase in civil litigation case filings across the nation.

[¶ 36] The weighted caseload study shows even with seven judges the Southeast Judicial District is already categorized as "high travel" when compared to the other districts. To require more windshield time from the remaining six judges is not good use of judicial resources in my opinion. This district consists of ten counties. I believe it will place a tremendous burden on the six remaining judges to provide the judicial services necessary to cover the loss of one judgeship, let alone handle the crush of trying to stay current with an increasing caseload.

[¶ 37] As difficult as it is to consider that our Court may find itself eventually in the unenviable position of taking away a job from one of our colleagues, it is the mandate of the legislature. The weighted caseload study reveals some of our judicial resources are cur-

rently in the wrong parts of our state. We now face the challenge of trying to assign judicial positions throughout the state based on our study's objectively demonstrated needs, the mandate of the North Dakota Legislature, and our state's qualitative needs. We are required to cut four more judicial positions by 2001. We currently have vacancies in the South Central and Northwest Judicial Districts under consideration. Our weighted caseload study indicates both districts could lose one judge and still handle today's caseload. Vacating those judicial positions would leave us with two more to cut. I join Justice Meschke in the hope the legislature will reconsider the number 42 and provide our court with some discretion in further cuts. If it does not, I believe, like Justice Meschke, that the odds will provide us in the next three years with vacancies without the necessity of ending a judicial career.

[¶ 38] I conclude Judgeship No. 1 in the Southeast Judicial District is necessary for effective judicial administration in that district and should be filled.

[¶ 39] Mary Muehlen Maring