2002 ND 124

In the Matter of the PETITION TO CHANGE THE DESIGNATION OF EITHER JUDGESHIP NO. 2 OR NO. 6 FROM VALLEY CITY IN BARNES COUNTY TO JAMESTOWN IN STUTSMAN COUNTY.

No. 20020057.

Supreme Court of North Dakota.

Aug. 2, 2002.

PER CURIAM.

[¶ 1] On March 1, 2002, Randall L. Hoffman and Dennis Dockter, both of Jamestown, North Dakota, filed a petition under N.D. Sup.Ct. Admin. R. 7.1 requesting this Court to relocate either Judgeship No. 2 or Judgeship No. 6, both judgeships being chambered in Valley City, to Jamestown, North Dakota.

[¶ 2] Under § 27–05–08, N.D.C.C., this Court has the authority to determine the location of the chambers of this state's district judges. Since November 7, 1997, this is the fourth occasion for this Court to review the number of judgeships and the locations of judgeships to meet the judicial needs of the Southeast Judicial District. See Judicial Vacancy in the Southeast Judicial District, 1998 ND 25, 574 N.W.2d 199; Judicial Vacancy in the Southeast Judicial District, 1999 ND 69, 592 N.W.2d 556; Judicial Vacancy in the Northwest Judicial District, 2001 ND 199, 637 N.W.2d 3. We take judicial notice of the information contained in those files.

[¶ 3] After notice, a hearing concerning the petition to transfer Judgeship No. 2 or Judgeship No. 6 was held in the Ralph J. Erickstad Courtroom of the Supreme Court on April 28, 2002. This order is based upon a consideration of all information received and reviewed by this Court, the criteria identified in N.D. Sup.Ct. Admin. R. 7.1, § 4, and the need for continued effective judicial services in the Southeast Judicial District.

[¶ 4] We have analyzed information under the criteria identified in N.D. Sup.Ct. Admin. R. 7.1, § 4, factors a., f., i., j., and l.

a. Annual district court combined civil, criminal and formal juvenile caseload for the most recent three-year period and any discernible caseload trends or patterns.

[¶ 5] Our weighted caseload study allocates the amount of judicial resources (including judges and judicial referees) needed to handle cases after weighting each type of case by the amount of time required to process an average case of that type. The study also allocates time not available for handling cases but which is required from a judge, such as travel time and time for the presiding judge to handle administrative matters. The resulting computation expresses the minimum judicial resources as the judicial Full Time Equivalent ("judicial FTE"), required to meet the needs of the district based upon weighted case filings. When the minimum judicial FTE's are compared to the judicial FTE's currently available, the difference is expressed as a positive number, indicating there are more judicial resources available than current weighted case filings require, or a negative number, indicating there are fewer judicial resources than are needed to serve those weighted case filings. Ideally a judicial district as a whole would show a small positive number, indicating judicial resources for that district have a margin for contingencies such as the prolonged illness of a judge and similar circumstances not currently accounted for in the

weighted caseload study as well as some margin for error in the structure of the study.

[¶ 6]   In *Judicial Vacancy in the Northwest Judicial District*, 2001 ND 199, 637 N.W.2d 3, we reviewed the weighted caseload statistics for this district.   Since the issuance of that order, we have had the results of the weighted caseload study for 2001.   Our study shows that the entire Southeast Judicial District has had a shortage of judicial resources.

| Year | Weighted Filings | Judicial FTE Required | Total Adjusted Judicial FTE | Difference |
|------|------------------|-----------------------|------------------------------|------------|
| 1997 | 380,050 | 6.53 | 5.88 | −0.65 |
| 1998 | 385,679 | 6.62 | 5.88 | −0.74 |
| 1999 | 390,350 | 6.70 | 5.88 | −0.82 |
| 2000 | 406,030 | 6.97 | 5.88 | −1.09 |
| 2001 | 374,380 | 6.42 | 5.88 | −0.54 |

[¶ 7]   Within the district, when examining counties with judges chambered in the county, it is clear that this judicial shortage falls primarily upon Stutsman County. Judicial overages and shortages are designated by county in the chart below.

| Year | Barnes | Dickey | Eddy | Richland | Stutsman |
|------|--------|--------|------|----------|----------|
| 1997 | 0.76 | 0.68 | 0.84 | −0.38 | −1.09 |
| 1998 | 0.75 | 0.64 | 0.82 | −0.36 | −1.15 |
| 1999 | 0.78 | 0.64 | 0.82 | −0.37 | −1.23 |
| 2000 | 0.84 | 0.61 | 0.81 | −0.43 | −1.15 |
| 2001 | 0.78 | 0.70 | 0.81 | −0.29 | −0.95 |

[¶ 8]   Judicial overage in a chambered county is required to meet the judicial service needs of non-chambered counties as well as other chambered counties within the district.   Given the geographical proximity of chambered and non-chambered counties in the district, the judicial overage in Barnes County is most proximate to the judicial shortage in Stutsman County.   However, judges chambered in Barnes County also travel to other counties in the district as required.

*f.   Proximity to detention facilities for adults and juveniles.*

[¶ 9]   Both Barnes County and Stutsman County have jail facilities.   Stutsman County is also the location of the James River Correctional Center, operated by the Prisons Division of the North Dakota Department of Corrections and Rehabilitation.   In addition, we note the location of the State Hospital for the Mentally Ill in Stutsman County.   To the extent the presence of these institutions makes demand upon our judicial resources, the demand has been reflected in our weighted caseload studies and are indicated in ¶¶ 6 through 8 above.   The following graphs indicate actual numbers of filings in certain categories in our weighted caseload study and the weight assigned to that category of cases by our study.

| Case Type | Case Weight | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|
| **Stutsman County:** | | | | | | |
| Felonies | 126.56 | 95 | 105 | 134 | 130 | 117 |
| Misdemeanors | 28.70 | 1175 | 1212 | 1309 | 1274 | 854 |
| Probate/Mental Health | 45.96 | 379 | 298 | 262 | 318 | 339 |
| **Barnes County:** | | | | | | |
| Felonies | 126.56 | 56 | 49 | 50 | 65 | 60 |
| Misdemeanors | 28.70 | 601 | 749 | 725 | 667 | 674 |
| Probate/Mental Health | 45.96 | 206 | 103 | 98 | 85 | 91 |

*i.  Impact of any change of chamber on travel time for judges, court personnel, attorneys, and litigants.*

[¶ 10] Under our weighted caseload study, the Southeast Judicial District is a high travel district. Our study allocates 12,300 minutes per year to each judge in the district for travel purposes. If either of the two judgeships were transferred to Jamestown, the total mileage chargeable to the state for travel purposes would likely be reduced as both Judge Simonson and Judge Paulson now currently travel to Jamestown on a regular basis. Comparing the two judgeships at issue, from July 1, 1999 through June 30, 2001, Judge Paulson has traveled more miles. He has traveled a total of 29,832 miles for an average of 828 miles per month. However, all of this travel is not to Jamestown, but includes travel to all parts of the district to provide judicial services as needed. If we assume that 80% of the average monthly travel expense of Judge Paulson could be eliminated as a result of the transfer of the chambers, this would be a savings of $205 (662 miles × $.31) per month to the judicial system. Even assuming such a relocation, the Southeast Judicial District would remain a high travel district as neither Judge Simonson nor Judge Paulson has averaged the highest or the second highest mileage in the district since July 1999.

[¶ 11] However, the transfer of the judgeship does not eliminate the actual travel as the governing statute, § 27–05–08, N.D.C.C., does not require a judge to live in the city where the chambers are located, but requires the judge to live within the district where the chambers are located. It is understandable that a judge who has lived in a community for several years and whose family has established community ties may not actually move as a result of the redesignation of the chambers. It is less likely that such a move would take place when the distance between the home community and the chamber community is approximately 30 miles, a manageable commuting distance. Therefore, for purposes of our decision, we assume that neither of the sitting judges would move to Jamestown and the actual savings would be in terms of mileage cost to the judicial system rather than a savings of actual travel time to the judge whose chambers have been relocated. While not an inconsiderable factor, we deem the cost savings alone insufficient to involuntarily move the chambers of either judge, both of whom have devoted substantial portions of their professional careers to the judicial needs of the Southeast Judicial District.

*j. Population distribution in the judicial district or de facto subdistrict.*

[¶ 12] Our prior orders have reviewed the population trends of the Southeast Judicial District. *See* 2001 ND 199, ¶¶ 8–17, 637 N.W.2d 3. The population of the district has declined from 90,995 in 1990· to 86,767 in 2000 and is projected to decline to 82,040 in 2015. The same sources indicate that Barnes County will experience greater percentage decline in population when compared with Stutsman County. From a population of 22,241 in 1999, reduced to 21,908 in 2000, and projected to decline to 20,762 in 2015, Stutsman County is expected to experience a seven percent decline in 25 years. By comparison, Barnes County is projected to decline from a population of 12,545 in 1990, and 11,775 in 2000, to a population of 10,216 in 2015, or a nineteen percent decline in 25 years. In the ten years between the 1990 census and the 2000 census, Stutsman County has experienced a two percent decline and Barnes County has experienced a six percent decline.

[¶ 13] Despite the fact population concentration impacts on demand for judicial services, we remain mindful of the legislative policy which directs a percentage of chambers to be located in our state's smaller cities. Section 27–05–08, N.D.C.C., provides: "However, not more than seventy percent of the chambers of the district judges may be located in cities with a population of more than ten thousand." The North Dakota State Data Center reports the population of Valley City as 6,826 and of Jamestown as 15,527 based on the 2000 census. Currently 64 percent of judicial chambers are located in cities of greater than 10,000. Transfer of this judgeship would result in 67 percent of judicial chambers being located in cities of greater than 10,000. It is apparent there will be reduced flexibility to respond to population shifts and still comply with § 27–05–08, N.D.C.C. At the same time, continuing compliance with the statutory directive will create inefficiencies within the judicial system like the one already experienced in the Southeast Judicial District.

[¶ 14] Factors a. and j. favor granting the petition. Factor f., to the extent it favors relocation, duplicates considerations under factor a. We regard factor i. as less significant because of the possibility that a judge whose chambers were relocated to Jamestown would continue to reside in Valley City under current circumstances.

*l. Recommendation of the presiding judge of the judicial district, after consultation with the judges of the judicial district.*

[¶ 15] We have said on a previous occasion that we regard the people who provide judicial services in the district as in the best position to understand the need to reallocate the available judicial resources. *See Petition to Change Resident Chambers from Watford City to Minot,* 2002 ND 54, ¶ 12, 643 N.W.2d 1. In response to the petition, Presiding Judge John T. Paulson appeared at the hearing to testify in opposition to the petition.

[¶ 16] In the hearing on this petition, Presiding Judge Paulson referred to the substantial upheavals in the provision of judicial services in this district which resulted from the death of Judge James A. Wright and the resignation of Judge Randall Hoffman, who is petitioner in this matter, which events required two of the previous reviews referred to in ¶ 2. Judge Paulson acknowledged the demands of responding to those changes have been absorbing and that insufficient time has been allocated to other administrative changes

that may improve the efficiency of providing services to the district. Judge Paulson acknowledged the district could benefit from additional help in revising administrative practices.

[¶ 17] Judge Paulson indicated that a relocation of chambers would preferably be occasioned upon the vacancy of a judgeship. Such a position is consistent with the preferred method of changing the designations of district judgeships. *See Matter of the Consultations Under Section 27–05–02.1*, 1999 ND 226, ¶ 38, 603 N.W.2d 57. However, the requirement of adequate judicial services must be the primary consideration of the court's exercise of its authority to designate the location of judgeships under § 27–05–02.1, N.D.C.C.

[¶ 18] Therefore, giving substantial weight to the opposition of the presiding judge, we decline to grant the petition to change the chambers of a judgeship from Valley City to Jamestown at this time. In doing so, we accept the suggestion of Presiding Judge Paulson to assist the district in reviewing administrative practices to alleviate the concerns expressed during this and prior hearings about the efficiency of judicial services in this district. If, after a reasonable opportunity to assess administrative practices and implement any necessary changes, we discern the need to change the chambers of a judgeship within the district, we may revisit the matter under the authority of this Court set forth in § 27–05–08, N.D.C.C. We deny the petition with the intent and confidence that the Honorable John T. Paulson, Presiding Judge of the Southeast Judicial District, together with the judges of the district and their successors, will continue to do their best to provide routine, effective judicial services throughout the district, including Jamestown.

[¶ 19]VANDEWALLE, C.J., NEUMANN, KAPSNER, MARING, and SANDSTROM, JJ., concur.